**CABOOL STATE BANK, Plaintiff–Respondent,**

v.

**RADIO SHACK, INC., d/b/a Tandy Corporation, Defendant–Appellant.**

No. 24381.

Missouri Court of Appeals, Southern District, Division One.

Jan. 30, 2002.

614

Mark A Fletcher, Lathrop & Gage, L.C., Springfield, for appellant.

Lee J. Viorel, Husch & Eppenberger, LLC, Springfield, for respondent.

KENNETH W. SHRUM, Presiding Judge.

In this court-tried case, Radio Shack, a division of Tandy Corporation ("Radio Shack"), appeals from a money judgment adverse to it and in favor of Cabool State Bank ("Bank"). The judgment amount ($15,529.43) represents the value of merchandise Radio Shack took from one of its franchised stores after the store closed. Bank alleged it had a lien on the merchandise superior to Radio Shack's claim, and the trial court agreed. Radio Shack's appeal charges three instances of trial court misapplication or misinterpretation of the law. This court affirms the judgment.

## STANDARD OF REVIEW

The decision in a court-tried case will not be disturbed on appeal unless the judgment is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976).

We presume the trial court's decision is correct, and Radio Shack (as the appellant) has the burden of showing error. *Walker v. Hanke*, 992 S.W.2d 925, 930[2] (Mo.App.1999). "The appellate court is primarily concerned with the cor-

rectness of the trial court's result, not the route taken by the trial court to reach that result." *Business Men's Assur. Co. v. Graham,* 984 S.W.2d 501, 506 (Mo.banc 1999). Therefore, the judgment will be affirmed under any tenable theory, no matter if the reasons advanced by the trial court are wrong or insufficient. *Id.* at 506[2].

## STATEMENT OF FACTS

On June 8, 1995, Michael Boudreaux ("Michael") and his wife, Debra Boudreaux ("Debra") contracted with Van Pamperien to buy a business from him.[1] The business was a retail electronics store operated under a franchise from Radio Shack. The contract involved the store inventory, fixtures, retail equipment, and a franchise agreement with Radio Shack. The sale closing was contingent upon Radio Shack approving transfer of the franchise to Boudreauxes. Ultimately, Radio Shack gave its approval, and the sale was consummated per the contract.

Michael and Debra borrowed money from Bank to buy this business. The loan documents included (1) a note that Michael and Debra signed individually and purportedly on behalf of "D & J Enterprises, Inc.," (2) a security agreement signed solely by Michael and Debra and which identified them, both in the body of the document and on signature lines, as borrowers and owners of the collateral, and (3) UCC–1 financing statements signed by Michael and Debra. On the UCC–1's signature lines, the only capacity identified for Michael's and Debra's signature was that of "Debtors." Contrarily, Bank listed "D & J Enterprises Inc., Radio Shack, Dealer, Debra K. Boudreaux, Michael C. Boudreaux" as "Debtors" at the top left-hand side of the UCC–1 documents. The UCC–1 filings covered, *inter alia,* "all inventory . . . whether now owned or hereafter acquired, substitutes and replacements thereof." In a similar vein, the collateral listed in Bank's security agreement included "[a]ll inventory . . . purchase[d] . . . from Van Pamperien and all inventory purchased or replaced."

The stipulation and attached documents (from which the stipulation is largely drawn) are confusing and often contradictory in describing what role two corporate entities (D & J Enterprises, Inc. and Tri–B Enterprises, Inc.) played in this business. Even so, according to the stipulation, in January 1998 "[t]he Boudreauxes and Tri–B . . . ceased business operations." On February 25, 1998, Radio Shack gave "[Michael] Boudreaux and Tri–B . . . [official notice] that the [franchise] Agreement # C068 was terminated." The inventory on hand when the store closed "had been acquired by the Boudreauxes and Tri–B . . . from Radio Shack after January 1997." Although Radio Shack had no security interest in the inventory, it took possession of it from "the Boudreauxes and Tri–B Enterprises, Inc." At the time, Radio Shack claimed the Boudreauxes and Tri–B owed Radio Shack $6,394.73. Bank then sued Radio Shack, and claimed Boudreauxes still owed Bank money and that Bank had a perfected security interest in the inventory superior to any claim Radio Shack might have.

The trial court entered judgment for Bank, and this appeal by Radio Shack followed.

## DISCUSSION AND DECISION

■ Radio Shack's first attempt at showing reversible error is rooted in cer-

---

1. When referring to Michael and Debra Boudreaux collectively, we call them "Boudreauxes." When referring to them individually, we call them "Michael" and "Debra." In doing so, we intend no disrespect.

tain assertions made by Radio Shack in the argument portion of its brief, i.e., (1) "the name of the store and the entity with which Radio Shack was doing business was changed from Michael Boudreaux d/b/a D & J Enterprises, Inc. to Tri–B Enterprises Inc. in late 1995[;]" (2) Tri–B was the only entity with which Radio Shack did business from November 1995 until January 1998; (3) the inventory Radio Shack took from the store after it closed had been sold to Tri–B, and no one else; and (4) because of the so-called change of name, § 400.9–402(7) was implicated.[2]

Based on these claims, Radio Shack argues that the so-called change of name was seriously misleading within the meaning of § 400.9–402(7); the inventory that Radio Shack took from the store was acquired exclusively by Tri–B more than four months after the so-called name change; Bank never filed a new financing statement within four months of the so-called name change, and therefore, Bank's original UCC–1 filings were ineffective to perfect a security interest in the inventory against Radio Shack.[3]

Radio Shack's first point maintains the trial court committed reversible error when it found otherwise, that is, the court erred as a matter of law when it found that "actual notice . . . of the initial secured claim of . . . Bank prevents it [Radio Shack] from invoking the provisions of § 400.9–402 because the change in name could not have been seriously misleading

with respect to Radio Shack." We disagree.

First and foremost, the argument thus advanced is based on flagrant mischaracterizations about what the record shows. Contrary to Radio Shack's post-trial assertions that after November 1995 it only did business with Tri–B and the inventory taken from the closed store had been sold exclusively to the corporate entity, Radio Shack *stipulated* it had sold the subject inventory to Tri–B Enterprises *and* Boudreauxs, and it took the inventory *from both parties*—not just Tri–B Enterprises—after the store closed. Radio Shack confirmed that it recognized and treated Michael, in his individual capacity, as having an ownership interest in the franchise and dealership after November 1995 when it stipulated that Tri–B *and* Boudreauxs "ceased business operations in January 1998[,]" and "[o]n February 25, 1998, Mr. Boudreaux *and* Tri–B . . . were given official notice . . . that the [franchise] agreement # C068 was terminated." Similar confirmation is found in documents that Michael submitted to Radio Shack after November 1995 (which it accepted) in which he described himself, individually, as Radio Shack's "Dealer" or "Franchisee."

We cannot discern exactly what role D & J Enterprises, Inc., played in this business, if any, nor do we know if an ownership interest in the inventory was ever transferred to that entity. The record also lacks evidence about the extent or nature of Tri–B's ownership interest in the inven-

---

**2.** All statutory references are to RSMo (2000) unless otherwise stated. We note that effective July 1, 2001, some of the provisions formerly in § 400.9–402, RSMo (2000) were amended and moved to 400.9–503, Cum. Supp. (2001) and what is now § 400.9–402, Cum.Supp. (2001) was formerly in § 400.9–317.

**3.** In pertinent part, § 400.9–402(7) provides:

"Where the debtor so changes such debtor's name or in the case of an organization its name, identity or organizational structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time."

tory. However, the record does show, without contradiction or conflict, that (1) Boudreauxes bought the original inventory in their individual names, (2) Boudreauxes gave Bank a security interest in the original inventory and "all inventory purchased or replaced," (3) Bank perfected its security interest in existing and future inventory owned by Boudreauxes by filing UCC-1 financing statements that listed Boudreauxes and D & J. Enterprises, Inc., as "Debtors," (4) Radio Shack had actual knowledge of the loan transaction between Bank and Boudreauxes, and (5) the subject inventory was sold to both the Boudreauxes and Tri–B. Throughout the relevant period, Boudreauxes were "Debtors" of Bank within the meaning of § 400.9–402(7), they never changed their name during the period, and (according to the stipulation) the subject inventory was sold to Boudreauxes and Tri–B. Under the circumstances, the potential defense under § 400.9–402(7) was not available to Radio Shack, and the trial court's holding regarding that section is surplusage.

Section 400.9–402(1) provides as follows:
"A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral."[4]

"A financing statement sufficiently shows the name of the debtor ... whether or not it adds other trade names or the names of partners." § 400.9–402(7). From the outset, Bank listed Boundreauxes (who admittedly had an ownership interest in the inventory) as "Debtors" on the UCC–1 filings. Because the financing statement was filed under the true name of at least one debtor/owner, there was no possibility the Bank's financing statement could seriously have misled Radio Shack. *See Drysdale v. Cornerstone Bank*, 562 S.W.2d 182, 184 (Mo.App.1978) (holding a true name filing in a "DBA" case was effective notice of security interest); *Sur–Gro Plant Food v. State Sav. Bank*, 730 S.W.2d 602, 604 (Mo.App.1987) (holding a financing statement that only listed two of the four partners as debtors, gave the partnership's lender a perfected lien on partnership collateral).

We find that Bank had a perfected security interest in the subject inventory, at least to the extent of Boudreauxes' ownership interest, whereas Radio Shack had no lien or security interest in the inventory. Section 400.9–402(7) was not implicated and the trial court did not err in entering judgment for Bank.[5] Point denied.

---

4. *See* n. 2.

5. Radio Shack cites *Matter of Lintz West Side Lumber, Inc.*, 655 F.2d 786 (7th Cir. 1981)(which Radio Shack says "is the identical situation to the instant case"), *In re Thomas*, 466 F.2d 51, 53 (9th Cir.1992), *Citizens Bank of Eldon v. Sportswear Shoppe Ltd.*, 15 B.R. 970 (Bankr.W.D.Mo.1981), *In re Janmar, Inc.*, 4 B.R. 4 (Bankr.N.D.Ga.1979), *In Re Eady*, 4 B.R. 1 (Bankr.N.D.Ga.1980) as authority that supports its position. We disagree. These cases stand for the proposition that failure to identify the actual owner of the assets in the financing statement is fatal to perfection of the lender's security interest. Although the facts of each case vary, each case involves a situation where, although two or more entities were involved, the secured party filed a UCC–1 form under an entity that did not own the collateral. This is a significant factual difference that renders the cited cases inapposite here. Radio Shack also cites *In Re The Inn at Grand Glaize, Ltd. v. National Bank of Washington*, 89 B.R. 40 (Bankr. W.D.Mo.1988). This case is factually distinct from the case at bar and is likewise inapposite.

In its second point, Radio Shack simply reprises the argument it made in Point I but in this instance, claims the trial court "erred as a matter of law in holding that Radio Shack's actual notice of the initial secured claim of ... Bank prevents it from raising technical deficiencies with ... Bank's filings." As it did in Point I, Radio Shack asserts Tri–B was the only entity that had an interest in the repossessed inventory; consequently, Radio Shack claims Bank had to comply with § 400.9–402.7 by filing an amended UCC–1 document naming Tri–B as its debtor. Radio Shack insists the trial court erred when it ruled otherwise.

We will not repeat our Point I discussion and analysis, other than to note that Boudreauxes were named as "debtors" in Bank's UCC–1 filings and, according to the stipulation, they and Tri–B purchased the subject inventory. Moreover, Radio Shack took the inventory from both Boudreauxes and Tri–B. On this record, § 400.9–402(7) was not implicated, and any finding by the Court regarding "technical" non-compliance with that statute was merely surplusage. Point II is denied.

Radio Shack's third and final point complains the trial court erred when it found that even if Bank's security interest was not valid, Radio Shack would not be allowed to keep the full value of the inventory. Our finding that Bank's security interest was valid renders this argument moot. Point III is denied.

The judgment of the trial court is affirmed.

MONTGOMERY, J., concurs.

BARNEY, C.J., concurs.